Good morning to the panel. May it please the court, my name is Alejandra Bird Lopez and I represent Mr. Jorge Correa-Osorio on this matter. I would like to reserve one minute for rebuttal if I may. Yes. I propose to focus on the eyewitness identification issue which is the first issue discussed in the brief because it is the linchpin of the case against Mr. Correa-Osorio. The entire case against Mr. Correa hinges on the identification of an alleged co-conspirator, Mr. Jose Vega-Torres, who testified that he had seen another supposed co-conspirator on three very brief occasions which may have lasted minutes or even only seconds and that happened, those encounters occurred in the summer of 2006. His identification of Mr. Correa as the person who he had seen came almost five years later in the trial which was held in the spring of 2010. This identification is inadmissible under the Due Process Clause according to the Supreme Court precedent because it resulted from a suggestive identification procedure and it was so unreliable as to raise a substantial likelihood of irreparable misidentification. Counsel, what happened here seems to be really quite routine in terms of how an identification procedure is carried out in our court proceeding. In your view, how should it have been done to satisfy your due process concerns? Well, in accordance with Supreme Court precedent, in order to be admissible, an eyewitness identification should not be suggestive. The procedure that is used should not be suggestive. This was a cookie-cutter question that was asked in the court and do you see that person here in the courtroom today? But previous to that, there had not been any foundation laid about the opportunity he had had to see the person, whether there was a face-to-face encounter, how close he was to the person who he had seen, there was no real basis or foundation for this person to answer that question. Weren't all those matters pursued on cross-examination in an attempt to impeach the reliability of the identification? Some of it was, yes, some of it was addressed. It did not cover the entire gamut of all the things that were wrong with this identification, but even so, the Supreme Court makes clear that under the Neal B. Vigars test, this evidence is not admissible unless those factors are addressed. Out of the presence of the jury, the witness should have been called and the prosecution should have established an appropriate foundation for the identification question before anything took place in the presence of the jury? One possible procedure would be to do a motion in limine, if they knew that this identification evidence was going to be brought, or when the question was posed, to object at that time and approach the court and say there has not been a sufficient foundation laid and we would like some voir dire or some questions outside the presence of the jury to establish that this identification is actually admissible under state law. But that wasn't done, counsel. It was nothing that prohibited defense counsel from objecting and making that request. That's correct, which is why we are on a plain error standard of review. The objection was not made. The fact is, even so, the conviction of Mr. Correa hinges almost entirely on this identification. There is virtually no corroborating evidence in this case. But the witness did testify about the three previous encounters, isn't that correct? He did testify about them. And so wasn't that just a matter of the credibility of the witness, which is the proper subject of the cross? Well, it... Testing the reliability of the identification as opposed to the admissibility? Well, what the Supreme Court precedent tells us is that this evidence is not admissible unless it meets the reliability criteria. Just on that point, your basic contention is whenever there is an individualized in-court identification such as this, Biggers applies? That's the basic thrust of it, right? It depends on the context. It depends on the context in this case. What about this case requires us to apply Biggers such that it would be plain not to apply Biggers? In this case, the question after speaking about the supposed co-conspirator who had been seen in 2006, the question was, and do you see this person in the courtroom today? And there was only one male defendant in the courtroom who could have been identified. So you are basically saying the way this played out on these facts was no different than a suggestive photo array. Exactly. Exactly. This is a functional equivalent. If this came as a suggestive photo array case, obviously Biggers would apply, and you could only admit the identification if it satisfied Biggers. Yes. And you say it's even though routinely people are identified in court, given the unusual circumstance here, a single male defendant, nothing else suggesting who it was, that this is no different than a suggestive photo array. Therefore, we go through Biggers, and under Biggers, you say it can't possibly pass. It's inadmissible. There are cases that are cited in the brief at page 26 which talk about the Niels B. Biggers test being applied in the context of in-court identification. So this is not something new. This does apply. And according to Supreme Court precedent itself, in Manson v. Brathwaite, the Supreme Court in its footnote 9 made it clear that this test does apply to in-court identifications if they are suggestive. So clearly here, the identification was the functional equivalent of a one-man show-up. There was really one choice, essentially, for the witness to pick. And could you just give me a little bit of context of why you say that? So it's true there was one male defendant, at least the government doesn't dispute, at the defense table. Mm-hmm. What evidence do we have in the record that it would have been obvious to the person making the identification that they would be identifying somebody who was the defendant in the courtroom? In other words, does he know that he's testifying against the defendant? The entire line of question that came before was implicating that person that he had allegedly seen on those three occasions. And then the next question was, and do you see that person here today? And I respectfully submit, everybody knows just on a gut level, this is the cliché question we see, right, in all the lawyer shows and everything. I'm sorry, my time is almost up. You may finish your answer, Counsel. Okay. The classic question that we see in all the shows, everybody knows what the answer there is supposed to be. The question is even suggestive. So unless there are other questions to address. Go ahead. Could you just say something about the prejudice bond? So if we get through Biggers and we were to conclude that under Biggers it is plain error to conclude it was a reliable identification in light of the suggestive nature, if we agreed with all of that, we would still, in order to conclude that it should not be admissible as a matter of plain error, have to say that the prejudice prong of the plain error inquiry was satisfied? Right. Could you just explain why that would be true and whether there's any First Circuit precedent that we could use that would guide us one way or the other on whether we should say that suggestive identification must be thrown out as plain error as opposed to simply saying who knows? Well, off the top of my head, I don't have that authority with me. I would be glad to look for some and submit it to the court. But basically the prejudice prong says that it affected the outcome of the trial. There is no other corroborating evidence in this case. Even the hearsay testimony, which is also objected to in our brief, only is relevant because it's connected to the witness's identification of this person. This case was investigated for two years. There are no photos. There are no phone records. There are no videos. There is no other evidence against my client other than this identification and the information that was associated with the person who Mr. Vega related Mr. Correa to. Thank you, Counselor. If you wish to submit a 28-J letter within the week, you may do so. Okay. Thank you very much. Good morning, Your Honors. Good morning, Counselor. May it please the Court, my name is Claudia Bolgan. I represent Ms. Denise Shepard Frazier. I'd like to reserve one minute for rebuttal, if I may. You may. Thank you, Your Honor. I'd like to start with my first argument, which is that there was no ‑‑ the government did not prove that Ms. Shepard knew that there was a controlled substance in her suitcase. The best case here for me is Perez Melendez cited in my brief. And the reason I say that is because that case stands for the proposition that knowing that something illegal is afoot is not sufficient. It may have been that a rational jury could have considered Ms. Shepard to know that there was something illegal in her suitcase. But that is simply not enough to convict her of the crime of which she was convicted. She had to know that there were controlled substances in her suitcase. And the proof on that particular issue is thin at best, if not non‑existent, to meet a beyond a reasonable doubt standard, which is the standard, of course, that this Court must protect, even in cases where the challenge is to the sufficiency of the evidence. Now, in this case, the government did prove that Ms. Shepard took $3,000 in payment for a trip to New York City for one day where she picked up two suitcases which she did not check. In addition, the government proved that she stayed overnight in a hotel room with many people, including Mr. Vega, who was the cooperating witness of the government. So in this, unfortunately, or fortunately for my client, is not enough to prove that my client knew the contents of the suitcase. So, Counsel, is it unreasonable to assume that conversations about what everyone was doing in New York took place? Yes, Your Honor, it is unreasonable. There was not a shred of evidence that Ms. Shepard saw drugs or that she saw money. Mr. Vega's testimony was to his knowledge, his own experiences, and there was not evidence to connect the two with respect to the issue of what was in the suitcases. Counsel, weren't bags containing large sums of money delivered to that motel room, and wasn't she paid her $3,000 from the cash that was contained in one of those bags? The testimony about the money reaching the hotel room and how the money was parceled out and how the money was packed into suitcases going back to Puerto Rico was sketchy at best. When Vega testified to these events, he did not place Ms. Shepard in the hotel room at the time that the money arrived. He did not place Ms. Shepard in the hotel room at the time the money was rolled up into rolls and put into toilet paper and otherwise hidden in the suitcases. There was no testimony at all as to her whereabouts during this period of time. Yes, Your Honor, there was testimony she was paid $3,000, but no, there was not testimony that she was paid from a large roll of money or a large sum of money that entered the hotel room in any particular way. Can you suggest who paid her? The record is also a bit sketchy on that, Your Honor. Mr. Vega could not recall whether he paid her or whether some other person paid her. He testified that she was paid. But by someone in the conspiracy? Yes, but he could not recall. Why wouldn't that itself provide a basis for concluding you're paid by somebody in a drug conspiracy $3,000 to take a suitcase to New York? Why isn't that sufficient evidence? Well, Your Honor, your question presupposes that there was knowledge that it was a drug conspiracy, and that is where we part company. No, no, I'm saying why wouldn't the fact that you were paid by a member of the drug conspiracy $3,000 to take a suitcase to New York? Why wouldn't it be enough for a juror to conclude that you knew that you were participating in a drug conspiracy? Why would that be irrational for a jury to conclude that? It would be irrational for a jury to conclude that because there was no evidence that Denise ever knew that the people with her were involved in a drug conspiracy. The issue is the defendant's actual knowledge here. And the striking thing about this case... Do we know how she knew either of the people who paid her? There is only testimony in the record that Ms. Shepard knew Mr. Vega in a friendly fashion as to living in proximity to one another or that they had known each other. They had known each other for quite a long time. Some 20 years? Yes, indeed, but interestingly also there was no testimony from Mr. Vega as to any details. There was no testimony as to whether they had ever had conversation about this or any other thing. It was very, very loose, very sketchy as to the association between Mr. Vega and Ms. Shepard. Did the government ask these questions of the witness? No. It wasn't just the witness was being vague in response to questions from the government? Yes, Your Honor. When one goes through the testimony of Mr. Vega, it is almost incomprehensible as to why these very particular questions weren't asked. The district court judge relied heavily, in fact almost exclusively, on a presumption that, well, everybody was packed into a hotel room, they must have discussed the nature of the trip. But there was never any questioning and never any testimony as to, well, was there conversation in the room? If so, what did that conversation relate to? The evidence in this case almost, as in Perez-Melendez, the commentary there was the testimony really related only to perhaps something suspicious, something illegal, but that suitcases could have contained weapons, they could have contained illegal currency, they could have contained pretty much anything. How did she return to Puerto Rico? In whose company did she return when she went back to Puerto Rico? Didn't she travel back with some of the individuals who were in that room? Yes, Your Honor. She traveled back with all of the individuals in that room. And was there any evidence of her further involvement? For example, we know the evidence indicates that Mr. Correa participated, I think, in the delivery of the cash when he returned perhaps to Mr. Santana. Is there any evidence about her involvement in further activities after she returns to Puerto Rico? Again, interestingly, the testimony that came out was that indeed one person came and picked up all of these returnees to San Juan and took them to Mr. Santana's house. But Mr. Vega testified that everybody else stayed in the car and then he and one other person went into Mr. Santana's house and delivered the bags. And the bags of money were only opened inside the house. And it was very clear that Ms. Shepard was not there when the bags were opened. And with regard to any further activity in this conspiracy, this all occurred in September of 2006. Ms. Shepard, rather than continuing in any such activity, went to school, became a nurse, got her nursing degree. And never to the knowledge of this transcript had anything further to do with this activity. Your Honors, I see my time is up. There are questions. Good morning. John Matthews on behalf of the United States. May I please the Court? Your Honors, I'd like to begin where we left off with my sister counsel's argument regarding the sufficiency of evidence against Ms. Denise Shepard. In this case, we had a conspiracy to possess with intent to distribute narcotics. The scheme was we had drug couriers who would come to the airport with baggage filled with old clothing that they would discard. Once at the airport, you would have an inside man or woman. Ms. Matthews, I think we understand how the scheme was laid out. Counsel's argument, though, is very specific, that even though her counsel may have suspected that there was criminality afoot, she didn't know specifically that it involved a drug conspiracy. So could you help us appreciate what evidence there may be in the record as to what her knowledge may have been about the nature of the conspiracy? Yes, Your Honor. Well, we had testimony from Mr. Vega, who was another drug courier, that he went to the airport to pick up Ms. Denise Shepard along with other co-conspirators. They met her with Manolo, who was a taxi driver who always picked up the same couriers and delivered the drug luggage to a different point. So he met her at the airport. They traveled to the same hotel that the drug couriers always travel to. In this hotel, each one of the co-conspirators stayed together in one room. So we're talking at least nine. But this was her one trip, right? This was her one trip. So regardless of how familiar the others may have been, this was her one trip. So what evidence is there that she should have been suspicious based on her one-time experience about the nature of the conspiracy? Well, this is a case where there is sufficient circumstantial evidence to point to her knowledge of what was going on in the conspiracy, including the fact that her ticket, her flight, and her initial flight was purchased by the leader of the conspiracy, Mr. Manuel Santana. She stayed in the room with all these other co-conspirators. They actually together packed more than $200,000 worth of cash in this hotel room with other co-conspirators, rolled them up in socks and concealed them so that they would not be contacted. She traveled back to San Juan, Puerto Rico with other co-conspirators, and she spent her whole time there. She spent her whole time in New York with the co-conspirators, including going to purchase new clothing, which had been because the old clothing had been discarded at the airport. So in this particular case, it seems that there is enough evidence for a reasonable jury to conclude that she was a part of this conspiracy and knew what was happening. I mean, the government's argument sounds a bit like an argument, what else could it be other than drugs? But as Judge Thompson is suggesting, that inference, what else could it be, that would suggest that she would have some familiarity with how these drug organizations carry out this kind of work? And there is no evidence of that kind of familiarity, is there? Well, although this was her one trip to New York, she did spend multiple days in New York with other co-conspirators, some of which, many of which, it wasn't their first trip. And so in this case, although it was her first trip, the amount of time that she spent with other co-conspirators, and just all the factors, if you look at them, it's indicative of a drug conspiracy. So I'm trying to figure out, I know you weren't handling the case below, but the government below didn't ask these questions of the cooperating witness. The nature of the conversation, was she in the room? Yeah, well, the government did ask some questions, including what was going on. There wasn't a lot of testimony on conversations between Mr. Vega and Ms. Shepard, although he did testify that he had known her for 20 years and was very familiar with her. There was not a lot of discussion of conversations that he had with her, and I think maybe that was because it was assumed that given the overwhelming circumstantial evidence in this case, the fact that you're staying in a relatively small room with only two beds with none of the co-conspirators in the modus operandi, going to buy new clothes. But Vega was never asked if he had ever had any conversations with her directly about the business he was in. Right. There's no, to my recollection, there isn't direct testimony as to that particular fact, but there is testimony regarding how the operation worked and the fact that Ms. Shepard was present during everything that happens in this. All the typical interactions and actions of the co-conspirators, specifically the drug couriers from San Juan to New York, there was a lot of testimony regarding that. But yes, you're correct, there wasn't direct testimony regarding exactly what Ms. Denise Shepard was doing. That's correct. Was a willful blindness instruction given in this case? Given the nature of the defense, it sounds like this is exactly the kind of case where such an instruction would have been appropriate. I don't recall, but I can check and provide some information. I'd next like to address just a couple issues that my sister counsel raised regarding Mr. Correa. In this case, like you said, Your Honor, this was quite routine. What was routine about it, apart from the fact that there are in-court identifications that occur, given that there's one male defendant there? Is your position that in a situation like that, you don't apply biggers at all? The government's position is that you don't get to biggers in this case because there was nothing about the testimony or the question that was suggested. So an in-court identification can never be subject to a biggers analysis? No, it could be subject to it. So what would have to happen for it to be able to be subject to it? For an in-court identification to be subject to biggers in this court, the government's position is that there would have to be something more suggestive about the initial questioning. As long as you ask a neutral question, biggers doesn't apply, even if there's only one defendant at the table and you're being asked to identify the male defendant in the case? Right. Why would that make sense? That would make sense because biggers in large part deals with what happens in either a lineup or a prior photo array. Is it Manson v. Braithwaite as in data in court identification case? Yes, Your Honor. Which is the same analysis as biggers. Yes, but this case is different because in this case, the defense didn't even object. Well, I totally understand that we'd be on plain error, but I guess the government's position, and I'm having trouble understanding, if it's a one-person show-up, you concede that biggers applies. If it's a suggestive photo array, biggers applies. You have an in-court identification in which the witness is being asked to identify the male defendant and there's one male defendant. It's put in neutral terms. Do you see the person in the courtroom? But what's the functional difference between that and saying could you identify the male defendant and there's only one at the table? Well, one difference is in this case the government didn't ask, you know, can you identify the defendant? I understand that. What's the functional difference between that and in a case in which the witness is only there to provide testimony against the one male defendant in the case and there is only one male defendant at the table? What is the difference? If the government can simply say in that situation, well, just ask it neutrally and then biggers doesn't apply, that seems functionally not very much in the spirit of Manson. Basically, if it was a show-up and you said, do you see the person, that doesn't insulate biggers from applying, so why should it be different in a courtroom? Right. Well, in a courtroom, at least in this particular case, although there was one male defendant, like Your Honor stated, there were many other people in the room and the government didn't direct the testimony toward the defendant. Was he there to testify about the defendant? He was there to testify about the defendant, about Ms. Cindy Shepard and about the nature of the conspiracy. Was there any other male defendant that he was there to testify about? No, there was no other male defendant that he was there to testify about. And was he testifying about anybody besides the defendant and Shepard? Well, he was. He was testifying about Mr. Manuel Santana. He was testifying about Mr. Soler. So there was testimony given. And was he known that they had pled already? By that time, he likely would have known. I mean, that's not in the record. Not super likely they'd be in the courtroom. Right. But in this case, like I said, he was testifying about a variety of issues, including Mr. Correa's involvement, but also Mr. Santana, Mr. Soler, all these other conspirators. Last on this, assuming Biggers applies, you don't really make an argument in the brief as to why it would satisfy the Biggers criteria? Do you think it could satisfy the Biggers criteria? No, Your Honor. In this case, even if we get to Biggers, which our position is that we don't, the totality of the circumstances is, although, so counsel mentioned that by the time of his trial it was five years, but there was obviously before that there was another identification prior to that. And during trial there was a lot of testimony about the interaction with Eldon or Mr. Correa. But Vega and Correa? Mr. Vega and Correa. So Mr. Vega did testify about the – Three times he saw him. The three times. Even for a total of a couple minutes five years before. Yes, the interactions were short, but our position is that that's a question for the jury. So the jury observed all this. They could see where Mr. Vega was vague about his general testimony, where he was very specific about others. The defense counsel had an opportunity to cross-examine Mr. Vega on these issues and from that make a determination. So just to be super clear, same facts as this case, and the only identification is the basis of the one-person show-up. You say that it would be reliable testimony? No, I think – That's Biggers. In other words, forget your point that Biggers doesn't apply and assume that we only know this defendant is Eldon because of a one-person show-up. If we then apply Biggers, you would say that a one-person show-up, it's still reliable if the nature of the identification is from these three interactions, a few minutes apiece, one of them through a window at an airport down to the tarmac? Well, no. A one-person show-up would be different because that's not an instance where you have anything else happening. So one distinction you can make is when you have a one-person show-up, there's some obviously identifying information about a defendant in the case. That's different because in a trial, the jury is listening to testimony. So the jury is basically observing, and it has to make a determination of whether this is reliable, including how he initially – what was the initial encounter with the defendant? What happened next? Okay, so what was happening? And so in this case, the jury observed Mr. Biggers' testimony and including testimony under cross-examination and found that he was credible. Now, if we were – if the prosecution were to understand that this kind of procedure is not compatible with Biggers, I understood that coming in. I mean, how would it cause you to change the way in which you would try to get permission to pursue an in-court identification? What would you have to do out of the presence of the jury before the judge in order to go forward with this kind of identification procedure? What would you have to do? Well, if there was a rule, you know, in this circuit, I think the government would raise the issue on its own with the district court and say, you know, we intend on presenting this witness. He will, you know, proceed with the in-court identification. Your Honor, is there anything you want us to do, including maybe seating other males at the table or, you know, making some sort of arrangement? And part of the problem in this case is that it honestly – if the defense counsel had an issue with it, it should have been objected to or maybe raised in a motion in limine and saying, hey, if there's one defendant here, we think the evidence in this case is weak and his testimony doesn't – you know, he didn't spend a lot of time with our defendants. So, Your Honor, can we please make some arrangement? And in this court, we've had situations where respectfully the government disagrees with this assessment that it's obvious that he's going to say it was this defendant. We've had cases where the government says, you know, do you recognize the defendant in this room? The witness looks around the whole courtroom and doesn't recognize anybody. And we've had cases where the government actually comes back and say, hey, do you see this gentleman in, you know, the black coat and the black pants? Do you recognize this person? And then, you know, subsequently, the witness says, oh, yeah, I recognize this person. And in those cases even, the court has said, you know, there was enough testimony in these cases. Isn't one thing the government could have done was a photo array first? Because then under Biggers, you have no real problem if he had done an earlier identification with a photo array that was itself not suggestive. Yes, Your Honor. And then you would do the in-court identification. But that wasn't done here, which I don't quite understand why. Yes, Your Honor. That could have been done and that would have made it easier. Then there's no problem at all. You could always do the in-court identification. Right. Yes, Your Honor. But that was not done here. That was not done here. And that's not because of the failure to object. No. Was it not done because the government thought that the witness had sufficient familiarity with the defendant and would be able to reliably identify him? I'm not sure about that. But for whatever reason, it wasn't done. And our position is that in court there was nothing overly suggestive about the questioning or about the way that it was done, including the fact that this case didn't start with testimony regarding Mr. Correa. There was a lot of testimony about everything that was happening, Mr. Vega's involvement from, you know, his involvement to arrest. So, you know, it wasn't done in a way to say, you know, you're here, you know, look at this defendant. Do you recognize him? Yes. Okay. And then move on. You know, it was open-ended. It says you see him in the courtroom. You know, how did you know him? How did you first meet him? And, you know, our position is that that was sufficient. Now, granted, it could have been done in a better way, but it's also the role of defense to object. Defense counsel says in her brief in an argument here that the sole evidence linking Correa to the conspiracy depends on Vega's testimony in two senses. He identifies him as the person who matches Eldon, who was in the conspiracy, whoever that may have been. And secondly, the co-conspirator statements that come in as hearsay, through the exception, are all statements made by Vega himself. So if Vega is not correctly identifying him, her position is there's just nothing in the case linking Correa to this conspiracy. So all we have is one person who was in the conspiracy who pled out now identifying him. What does the government point to beyond Vega's testimony that ties Correa to this conspiracy? That, I mean, Mr. Vega, his testimony was the primary testimony. I guess I'm asking, is it the exclusive? Yes. I mean, as far as direct evidence, Mr. Vega's testimony regarding Ms. Correa's involvement is what made the case. Thank you, Counsel. Thank you, Your Honor. As briefly as possible, there is a bit of an elephant in the room that I want to address, and the prosecution made reference to it, which was that there must have been a prior identification of this witness. The truth is that it's difficult to imagine a prosecutor who takes a case all the way to trial without knowing that his witness is going to identify, if that's the evidence, the sole evidence they're relying on. The fact that there was a prior identification of this witness, I'll tell you what is on the record. What is on the record is that Mr. Vega was arrested in the fall of 2006, and he did not mention these encounters or this person. He was decided to cooperate in 2007, and at that time he did not mention this person. In 2008, he was interviewed by law enforcement again, and he did not mention this person. His identification then necessarily, because of what's expressed on the record, of Mr. Correa as the Don must have come later. So already there's a lag in time. If I could briefly just finish this thought. Yes. The fact that there is a previous identification, and there is information in the discovery material, which I won't go into unless I'm asked about it, because it's not on the record. The fact that there's a previous identification really only makes matters worse, because even in U.S. v. Wade, the Supreme Court recognized that these pretrial exchanges with law enforcement regarding identifications are likely to pollute in-court identifications by, and I'm quoting, serving to crystallize the witness's identification of the defendant for future reference, with the result that the State may then rest upon the witness's unequivocal courtroom identification and not mention the pretrial identification as part of the State's case at trial. So I think that it's important that the Court address the fact that in virtually all of these, it's difficult to imagine a case in which there hasn't been some kind of previous identification. And it really only creates more concern and more unreliability and, frankly, more suggestion, more suggestion because there's already been a suggestion that that's the person, and then when they see them for a second time, they may be recognizing the photograph that they saw before instead of the actual person in the actual incident, if there's nothing further. Counsel, I know pretrial discovery is much more limited in criminal cases, but, I mean, you are, for the reasons you're explaining, you're drawing the inference that there must have been some kind of pretrial identification procedure. Are you in a position to actually determine what happened pretrial through discovery measures that are available to you? I can only explain what I saw, if you'd like, from the discovery. There is evidence. I'm just asking generally about the discovery procedures would be available to defense counsel in a case such as this to actually make the determination as to what kind of. Well, I believe counsel can ask for the information, and it should be discoverable. And that was not done here, I guess. The information is in the discovery materials that were available to me at trial. It is in or has not been? It is. It is in the information that I received. I was not trial counsel. I don't know when counsel received that information, trial court counsel. You're saying in the record there is evidence from discovery of a prior identification? Not in the record. In the discovery materials that I received when I took charge of the case, there are police reports that make reference to a previous identification. There are also police reports that are heavily redacted, and I frankly have not gone through the exercise to see if that part was redacted or not, and I don't have a record of when exactly each piece was received by trial court counsel. When you say prior identification, do you mean a prior formal identification at the police station? What kind of identification are you referring to? You're referring to something outside of the three encounters? It's something outside of the four corners of the record, but basically the... Is it something outside of the three encounters? It's something outside of the three encounters which occurred after Mr. Vega had been arrested and had been cooperating for years with the government. And that discovery was made known to the defense counsel? I don't know exactly when. The answer to that question is I don't know exactly when. I don't think I have documents to show me exactly when. Okay, but I think you're telling us that you were able to make a determination from the discovery that was made available to you that there was some kind of an identification procedure pursued prior to trial, a procedure that would have allowed Mr. Vega to identify Mr. Correa as the individual that he had seen on these other occasions? Is that what you're telling us? Yes. Yes. Just so I'm clear, you mean it in the sense that, well, I don't quite know what we're supposed to do when it's not in the record, but just so I'm clear, there's two possibilities. One is what you're saying is that he provided an earlier identification. That would seem to confirm the reliability of the identification in court. Unless that identification was unreliable or suggestive. Or suggestive in that setting, in which case it would have polluted it and rendered less reliable. Exactly. It would render the in-court identification even less reliable than it already is. I think my time is way up unless there are any further questions. Just one thing. In the record, if I write that Vega testifies, whether it's testimony, maybe it's by Vega, that he was employed by the employer whose employees at the baggage handling were involved in the conspiracy, but that Correa himself, it turned out, was never employed by the same employer that was the employer for all the other baggage handlers in the conspiracy. Is that right? Let me make sure that I understand the question. Or let me state it in another way. Mr. Correa Osorio was employed by Ivy Port, which was a different company than he was claimed to have been employed by in the indictment, which was GMD, and GMD was the employer for, I believe, all the other facilitators or baggage handlers that were in the case. Was there any other facilitator from Ivy Port in the case? There was not. And two airport employees testified in the case, and I believe they were both from GMD, and neither of them identified Mr. Correa as having any participation in the conspiracy. Thank you, Counsel. Thank you very much. Your Honors, with respect to the presentation of Brother Counsel, the flight from Ms. Shepherd was not purchased by Mr. Santana. It was purchased by a person named Maritza Gonzalez, who has no other information about her in the record. The flight home was purchased by Mr. Vega in cash. With respect to spending the whole time purchasing clothing in New York, there is absolutely nothing in the record to suggest that Ms. Frazier purchased anything in New York. With respect to the multiple days in New York assertion, the record indicates Ms. Shepherd flew to New York on the 9th of September, 2006, and returned to Puerto Rico on the 10th of September, 2006, for a one-day trip. There is no testimony at all on conversations with Mr. Vega, as opposed to not a lot. And with respect to your question, Justice Lopez, as to whether there was a willful blindness instruction in this case, there was not. I've reproduced the entire jury instructions at Appendix 431. Thank you, Your Honors. Thank you, Counselor.